UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| United States of America, | |
|---|---|
| v. | |
| ALFONSO PORTILLO, Defendant | 09-CR-1142 (LAP) |
| and | OPINION & ORDER |
| OTILIA PADUA PORTILLO, Claimant-Third-Party Petitioner. | |

LORETTA A. PRESKA, Senior United States District Judge:

Ortilia Padua Portillo asserts a third-party interest in some of the assets in three bank accounts preliminarily forfeited in the underlying criminal proceedings against her father, Alfonso Portillo ("Defendant"). (See Petition in Response to Forfeiture Order ("Petition"), May 31, 2016 [dkt. no. 91].) Petitioner argues that the Government had no basis to seek forfeiture of funds beyond the $2.1 million directly traceable to Defendant's money laundering conspiracy. But if the property was subject to forfeiture, Petitioner asserts that she has a superior legal interest in the excess funds above the $2.1 million because she is the beneficial owner of the accounts.

For the reasons below, the Court concludes that the Government was entitled to seek forfeiture against Defendant of the excess funds. However, under the law of the relevant jurisdictions, Petitioner has proven a superior legal interest in the excess

funds, so the Government is limited to the $2.1 million that constitutes crime proceeds. Accordingly, the Court GRANTS the Petition asserting a third-party interest.

## I. **Background**

### A. The Indictment, Defendant's Guilty Plea, and the Forfeiture Orders

On December 1, 2009, the Government secured an indictment against Defendant for one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(a)(2)(B)(i). (Indictment, Dec. 1, 2009 [dkt. no. 2] ¶ 16.) The Indictment charged Defendant with a variety of unlawful conduct during the time he served as the President of Guatemala between 2000 and 2004. (Id. ¶ 1.) The Government alleged that Defendant embezzled money from the Guatemalan Ministry of Defense, misappropriated funds from the publicly financed reserves of one of Guatemala's national banks, and illegally received $2.5 million in checks from the government of Taiwan that Defendant laundered through accounts in Europe through at least 2006. (Id. ¶¶ 3-12.)

As it pertains to the $2.5 million in checks, the Government asserted that they were deposited into a bank account in Miami, Florida, and then "diverted, in a series of transactions and transfers designed to conceal the source and origin of the funds," to European-based bank accounts in the names of Petitioner and/or Defendant's ex-wife, including accounts at the Banco Bilbao

Vizcaya Argentina ("BBVA") in France, UBS in Luxembourg, and Banque Audi Suisse S.A. ("Bank Audi") in Switzerland. (Id. ¶¶ 4-9.) In addition, and relevant to the BBVA account, the Government also alleged that Defendant's misappropriation of funds from the Ministry of Defense led to a deposit of $516,462.24 from a company called "Corporacion de Electrónica de Guatemala S.A." or "COEGSA" into that account. (Id. ¶ 11.)

The Government included a forfeiture allegation in the Indictment for "all property, real and personal, involved in the money laundering offenses and all property traceable to such property." (Id. ¶ 19.) On August 9, 2012, the Government filed a bill of particulars providing notice that specific property was subject to forfeiture. (Government's Bill of Particulars [dkt. no. 17].) That property included:

> (a) Approximately €491,254.90 in Euros formerly on deposit [at BBVA];
>
> (b) Any and all funds in the name of "Excell Life International S.A. Invest Dedie Police 50100118," currently or formerly held on deposit at any time between January 14, 2000 and the present in . . . UBS Luxembourg, including but not limited to the following:
>
>> (1) €903,150.67 in Euros formerly on deposit [at] UBS Luxembourg . . . in the name of "Excell Life International S.A. Invest Dedie Police 50100118" and currently being held at Banque & Caisse D'Epargne De L'Etat in Luxembourg;
>>
>> (2) $10,831.55 in United States Dollars formerly on deposit in [the] UBS Luxembourg account . . . in the name of "Excell Life International S.A. Invest Dedie

Police 50100118" and currently being held at Banque & Caisse D'Epargne De L'Etat in Luxembourg;

(c) Any and all funds or bonds/investments currently or formerly on deposit at any time between January 14, 2000 and the present in Banque Audi (Suisse SA) account numbers 049345/001.000.978 and 0684500/001.000.978.[1]

(Bill of Particulars.) The Court entered a Post-Indictment Restraining Order on the same day. (Post-Indictment Restraining Order Pursuant to 18 U.S.C. § 982 and 21 U.S.C. § 853, Aug. 9, 2012 [dkt. no. 18].)

On March 18, 2014, pursuant to a plea agreement with the Government, Defendant plead guilty to conspiracy to commit money laundering. (Plea Tr. [dkt. no. 77] 25:25.) During Defendant's change of plea hearing, the Court ensured that Defendant knew of the forfeiture allegation in the Indictment. (Id. at 24:8-15.) Defendant provided an allocution exclusively about his acceptance of the checks from the government of Taiwan and his subsequent laundering of those funds. He did not admit to the other criminal conduct charged in the Indictment. He stated:

> From in or about December 1999, through in or about August 2002, just before I became the president of Guatemala, and while I was president of Guatemala, I received, at various locations in Guatemala, a total of $2.5 million in payment from the government of Taiwan. I understood in exchange for these payments I would use my influence to have Guatemala continue to recognize Taiwan diplomatically. The 2.5 million was made up of three checks each in the amount of $500,000

---

[1] Collectively referred to herein as the "Specific Property."

made payable to me personally and two checks each in the amount of $500,000 made payable to Oxxy Fiancial Corp. I knew that all of the money from Taiwan came from an account at the International Bank of China in New York City. Knowing that the $2.5 million was the proceeds of the illegal payments from Taiwan, I agreed with others, including certain Guatemalan bankers, to move the $2.5 million through banks in the United States. We did so by having the 2.5 million carried from Guatemala to the United States and then deposited during the years 2000 and 2002 into bank accounts in Miami, Florida and Washington, DC. Knowing that these transactions were designed, in part, to conceal and disguise the source and ownership of the money, I knew that at least some of the proceeds from Taiwan were then transferred into an account in Europe, and that those proceeds were then further disbursed into different accounts and financial institutions in Europe into 2005. I knew at the time that what I was doing was wrong, and I apologize for my crimes, take responsibility for them and accept the consequences of my actions.

(Id. at 27:1-28:4.)

Defendant was sentenced on May 22, 2014. The Court acknowledged that "[t]his case is limited" to "the charges that the defendant used money received from the Taiwanese government to further their continued recognition." (Sentencing Tr. at 88:15-18 [dkt. no. 87].) The Court sentenced Defendant to 70 months' imprisonment without supervised release because Defendant "will be deported upon completion of his sentence." (Id. at 92:24-93:2.) The Court added that the parties provided a "proposed consent preliminary order of forfeiture" and ensured that "both sides have

reviewed it and signed [it], including the defendant." (Id. at 93:3-8.) The Court signed and entered the Consent Preliminary Order of Forfeiture on the same day as the sentencing. (Consent Prelim. Order Forfeiture/Money J., May 22, 2014 [dkt. no. 85].) Defendant agreed "to forfeit a sum of money equal to $2,500,000 in United States currency, representing all property, real and personal, involved in the money laundering offense charged in Count One of the Indictment" and consented "to a money judgment in the amount of $2,500,000.00 in United States currency, representing the amount of proceeds obtained as a result of the offense charged in Count One of the Indictment." (Id.) The Court retained jurisdiction to enforce the Consent Preliminary Order of Forfeiture/Money Judgment. (Id. ¶ 6.)

On December 1, 2015, the Court ordered the forfeiture of the Specific Property, subject to the adjudication of any potential third-party claims. (Consent Preliminary Order of Forfeiture as to Specific Property, ("Specific Property Order") [dkt. no. 90].) The Order characterized the previously entered preliminary forfeiture order as the "Money Judgement," explaining that it "did not address the Specific Property." (Id. at 3.) Defendant consented to forfeiting his "right, title and interest in the Specific Property." (Id. ¶ 2.) "The Specific Property constitutes property involved in money laundering and is subject to forfeiture." (Id. ¶ 1.) After resolving any third-party interests in the Specific

Property and "[u]pon the entry of a Final Order of Forfeiture for the Specific Property, any of the Specific Property forfeited shall be applied in partial satisfaction of the [$2.5 million] Money Judgment." (Id. ¶ 3.) Both preliminary forfeiture orders (referred to herein as the "Forfeiture Orders") are final as to Defendant. See Fed. R. Crim. P. 32.2(b)(4)(A).

**B. The Third-Party Proceedings**

    1. <u>Statutory Framework</u>

The adjudication of an individual's interest in property subject to forfeiture proceeds in two stages. At stage one, during a defendant's criminal proceeding, the court must assess the forfeitability of the assets "without regard to any third party's interest in the property." Fed. R. Crim. P. 32.2(b)(2)(A). It is not until stage two, after the criminal proceedings have concluded, when the court may entertain a third-party's claim over assets covered by a preliminary forfeiture order. 21 U.S.C. § 853(n). To succeed on a third-party petition, the petitioner must demonstrate a legal interest in the property that grants her standing and "entitlement to relief on the merits by establishing, through a preponderance of the evidence, [a] superior claim[] to the property." <u>United States v. Watts</u>, 786 F.3d 152, 160 (2d Cir. 2015).

Under the section of the statute relevant to this proceeding, 21 U.S.C. § 853(n)(6)(A), the petitioner must demonstrate "a legal

right, title, or interest in the property, [that] was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property." "Because forfeitable property vests in the government immediately upon the commission of a criminal act, a third party may prevail under § 853(n)(6)(A) only by establishing that he 'had a legal interest in the forfeited property <u>before</u> the underlying crime was committed' - that is, 'before the government's interest vested.'" <u>Watts</u>, 786 F.3d at 166 (citation omitted).

### 2. Ms. Portillo's Petition

On May 31, 2016, Petitioner filed a Petition and Request for Ancillary Hearing dated May 19, 2016, asserting a claim to part of the Specific Property. (<u>See</u> Petition.) The three accounts (the "Target Accounts") that make up the Specific Property have always been held exclusively in Petitioner and/or her mother's names, including at the time of the commission of the acts underlying Defendant's conviction. <u>United States v. Portillo</u> ("<u>Portillo II</u>"), No. 09-CR-1142, 2022 WL 624580, at *4 (S.D.N.Y. Mar. 3, 2022). In total, the Target Accounts include approximately $2.9 million.[2]

---

[2] The Court simply refers the amount as stated at the time of the trial without accounting for changes in exchange rates. But the amount is likely different now given that the value of the Specific Property has changed during these proceedings. (<u>See</u> Hearing Tr., Mar. 27, 2019 [dkt. no. 128] 3:17-19; Pet'r Pre-Trial Br., Aug. 31, 2022 [dkt. no. 174] 3.)

Petitioner contends that while the Government is entitled to the $2.1 million it traced as proceeds of Defendant's crime, she is entitled to the remainder given that she is "her mother's rightful heir and beneficial owner of the Target Accounts." (Pet'r Pre-Trial Br., Aug. 31, 2022 [dkt. no. 174] 4-5.) The Government asserts, on the other hand, that it is entitled to all assets in the accounts because the remainder was "involved in" money laundering or was from "[s]ources of funds that are alleged to come from criminal activity" for which "the defendant was indicted . . . but not convicted." (Trial Tr. ("Tr.") [dkt. nos. 175, 177] 10:5-10.)

After the close of civil discovery, on November 17, 2017, the Government moved for summary judgment, asserting that because Petitioner's purported superior interest did not vest until Ms. Gonzalez's death in 2010, which was after the Government's interest vested in 2002 when the acts giving rise to the forfeiture began, she did not have any claim to the Specific Property pursuant to Section 853(n)(6). United States v. Portillo ("Portillo I"), No. 09-CR-1142, 2019 WL 1949861, at *4 (S.D.N.Y. Apr. 17, 2019). This Court rejected the Government's restrictive application of the statute. The Government's position would only allow a petitioner to succeed if "she showed that the interest was vested or that the interest was both vested and superior." Id. That is not what the plain text of the statute requires. Instead, "a valid interest may

be held by anyone at" the time of the commission of the acts giving rise to forfeiture "and then acquired by the petitioner consistent with state law. A petitioner must be able to demonstrate a superior interest by showing that he or she has a current legal interest in the property and that the interest existed at the time of the commission of the crime." Id. at 5.

Thus, the question became "whether Ms. Gonzalez had a legal interest in the property at the time of the commission of the acts that Petitioner acquired thereafter consistent with state law." Id. Because "[a] determination of Ms. Gonzalez's interest in the Specific Property [would] turn on the law of the relevant jurisdiction," the Court asked the parties to brief whether Ms. Gonzalez had an interest in the Specific Property pursuant to the law of the relevant jurisdiction. Id.

With consideration of the additional briefing by both parties, on March 3, 2022, this Court denied the Government's motion for summary judgment. Portillo II, 2022 WL 624580, at *5. The parties agreed "that the law in France, Luxembourg, and Switzerland establishes 'a rebuttable presumption of ownership . . . in favor of the individual or entity in whose name a bank account is held,' i.e., the 'individual or entity who appears as nominal or beneficial owner of an account.'" Id. at *4 (citation omitted). Viewing the summary judgment record, this Court held that "Ms. Gonzalez and/or Petitioner are presumed to be

the beneficial owners of the Target Property at the time of Mr. Portillo's commission of the acts, and the Government has not rebutted that presumption." Id. Further, the existence of disputed material facts necessitated "resolution at trial." Id.

A trial was held on September 7 and 8, 2022. Petitioner testified and called her aunt, Yamel Padua Gonzalez, to testify. The Government called Cezary Tchorznicki, a former special agent of the Internal Revenue Service and co-lead investigator in the criminal case, to testify. (Tr. at 109:19-21, 110:22-24.) As relevant here, Mr. Tchorznicki conducted a financial tracing analysis in the criminal case to identify the "ownership of different accounts and assets" and "who has authority . . . to move the money around" and to "determine whether certain transactions were conducted with intent to obfuscate, obscure, the source, the nature of transactions, the beneficial owners of the assets, and so forth." (Id. at 112:1-10.)

Petitioner submitted a post-trial brief in support of her Petition on October 17, 2022. (Pet'r Post-Trial Br. [dkt. no. 181].) The Government filed an opposition brief on November 16, 2022. (Gov't Post-Trial Br. [dkt. no. 182].) Petitioner filed a reply on November 30, 2022. (Pet'r Reply [dkt. no. 183].)

## II. **Findings of Fact**

Petitioner's parents, Defendant and Ms. Gonzalez, wed in 1977. (Tr. at 30:9, 30:19-21). They separated in the "mid to late

'80s" and finalized their divorce on January 11, 1991. (Id. at 31:24-25; CX[3] 8.) Ms. Gonzalez generally lived in Mexico City for her entire life. (Tr. at 93:25-94:2.) She never lived in France, Luxemburg, or Switzerland, although she would occasionally visit Paris, France. (Id. at 94:3-8, 95:19-23.)

Petitioner was born in Mexico and lived there for essentially all of her life. (Id. at 29:21-22, 32:5-9, 34:20). She grew up in "an upper middle-class neighborhood." (Id. at 37:20-23.) She attended a "very expensive" private school in Mexico called the American School Foundation for elementary, secondary, and high school. (Deposition of Petitioner ("Dep."), Sept. 15, 2017 [dkt. no. 110-6] 9:13-20; Tr. at 34:23-35:14.) Ms. Gonzalez "through the help of [Petitioner's] grandfather" paid for the American School Foundation until Petitioner's graduation in 1999. (Tr. at 36:5-22.) Up until Petitioner was twenty years old, Petitioner's family paid for a nanny, and Petitioner had no reason to believe that those payments caused any financial hardship on her family. (Id. at 38:15-39:2.)

Petitioner lived in England as a young adult. (Tr. at 32:5-9.) During the time period relevant to Defendant's crime, Petitioner was primarily a student and both of her parents paid

---

[3] "CX" refers to Petitioner's exhibits that were admitted during the trial, and "GX" refers to the Government's exhibits that were admitted during the trial.

for her tuition. (Id. at 85:5-12.) She briefly attended a college in Mexico before moving to London to attend the Architectural Association for a one-year program. (Dep. at 9:25-11:8; Tr. at 32:12-13.) Thereafter, Petitioner attended Cambridge University from 2001 to 2004, where she graduated with a degree in architecture. (Dep. at 11:10-12:3; Tr. at 33:7-11.) She worked in Mexico between 2004 and 2006 as an architect and filmmaker before returning to the Architectural Association in London for additional studies. (Dep. at 12:7-14:5; Tr. at 32:12-33:6.) Petitioner never lived in France, Luxemburg, Switzerland, or Guatemala. (Tr. at 96:7-11; Dep. at 13:14-15.)

Petitioner's grandfather Jorge Filemon Padua Fadel ("Mr. Padua") and her mother were wealthy individuals independent of Petitioner's father. (Tr. at 21:7-23:6; Dep. at 71:14-16, 78:5-11.) For example, Petitioner's family owned a significant amount of property in Mexico. (Tr. at 43:8-52:3.) Before Mr. Padua's death on May 11, 1997, he gifted Petitioner's mother real property, cash in Mexican pesos and United States dollars, gold coins, and jewelry. (Rule 56.1 Statement, Nov. 17, 2017 [dkt. no. 111] ¶¶ 10, 12.) During Petitioner's life, she saw jewelry, coins, and United States dollars in a safe-deposit box when she accompanied her mother to a local bank in Mexico. (Tr. at 40:3-14.) Upon Ms. Gonzalez's death on May 18, 2010, all of Ms. Gonzalez's assets – including those inherited from Mr. Padua – were bequeathed to

13

Petitioner pursuant to Ms. Gonzalez's will, which was prepared on or about January 24, 2001 and named Petitioner as her sole heir. (Rule 56.1 Statement ¶¶ 13-15.)

Petitioner claims that the assets her mother received from her grandfather were deposited into the Target Accounts. (Petition ¶ 23.) But Petitioner's deposition and trial testimony do not support that assertion. As far as the property gifted to her mother, such as the jewelry and coins, Petitioner did not know whether proceeds from their sale entered a bank account. (Dep. at 86:3-17, 87:4-8, 120:11-19.) While Petitioner made considerable efforts to obtain her mother's bank records, she did not receive information from the relevant banks that would allow her to trace any of her family's funds to the Target Accounts. (Tr. at 54:16, 55:11-56:3, 57:12-58:6, 79:3-19; Dep. at 80:17-22.) (Notably, Mr. Tchorznicki also explained that there were some jurisdictions that did not respond to the Government's document requests, so even he could not review a "complete universe of relevant bank records." (Tr. at 115:11-20.)) In addition, Petitioner agreed that she did not track her mother's expenses, manage her bank accounts, or control her assets. (Id. at 87:19-24.)

Based on the bank records themselves, it appeared to Mr. Tchorznicki that Ms. Gonzalez personally conducted certain transactions with the relevant banks, while there were other transactions where Mr. Tchorznicki could not tell who personally

performed them by reviewing the bank records. (Id. at 184:16-186:3.) Nonetheless, Petitioner and Mr. Tchorznicki provided some information about each of the Target Accounts and Ms. Gonzalez's finances.

### A. The BBVA Account

The BBVA account was opened in November of 2000. (GX 100.) Petitioner recalled going to Paris with her mother to open it. (Tr. at 56:10-17.) Petitioner said that she occasionally assisted her mother with her financial transactions by accompanying her to the bank and drafting paperwork or requests to transfer money. (Dep. at 37:5-17.) On one occasion, Petitioner wrote a letter for her mother to request that money be sent to the BBVA account in France. (Id. at 37:20-38:13.)

Mr. Tchorznicki testified that the BBVA account received the proceeds of the checks related to Defendant's crime, beginning with two checks dated July 25, 2000, each for $500,000. (GX 201; Tr. at 126:20-25.) Those checks were first deposited in an account at Hamilton Bank on August 9 and 11, 2000, which issued new checks in the amounts of $500,000, $225,000, and $275,000. (GX 201; Tr. at 127:3-9.) Mr. Tchorznicki traced those checks to Riggs Bank National Association (a U.S.-based bank), before they were moved to a Riggs Bank trust on August 24, 2000, of which Ms. Gonzalez was the beneficiary and Defendant was the settlor. (Tr. at 127:9-

15.) Thereafter, on March 23, 2003, $966,655.58 was transferred
into the BBVA account. (GX 201.)

In the next round of money laundering, the proceeds of two
checks, each dated August 7, 2002, made their way into the BBVA
account. (GX 202.) Those checks were first deposited into a bank
account in Miami, before $999,850 was transferred into a different
subaccount. (Id.) On November 26, 2002, $322,430.64 was
transferred into the BBVA account, and then, on December 16,
$322,410.64 was moved to a subaccount. (Id.)

Separately, Mr. Tchorznicki explained that there were
significant outgoing transactions from the BBVA account to three
other accounts. First, on October 29, 2002, Ms. Gonzalez ordered
a wire transfer of $500,000 from the BBVA account to a Riggs &
Company International account in London. (GX 203; Tr. at 130:23-
25.) Second, on April 28, 2003, $1,001,507.57 was wired from the
BBVA account to the UBS account. (GX 203; Tr. at 132:8-10.) Third,
on August 2, 2004, €2,236,300 was wired to Bank Audi, and on August
4, 2004, $337,976.16 was wired to Bank Audi. (GX 203; Tr. at
132:12-15.)

Mr. Tchorznicki testified about a significant incoming
transaction distinct from those traced to the checks from the
Taiwanese government: a wire transfer of $516,462.24 that
originated from a Guatemalan company called COEGSA was deposited
on May 9, 2002. (Tr. at 122:4-19; GX 200.) The Government asserts

that this deposit into the BBVA account by COEGSA also derived from Defendant's money laundering (see, e.g., Tr. at 229:1-8), but Defendant's guilty plea, allocution, and sentencing did not address the COEGSA payment. Petitioner did not have an understanding, apart from what she reviewed during discovery, of who made certain transactions or her mother's connection to them, such as the COEGSA wire. (Dep. at 141:7-13, 143:8-144:9, 164:18-21, 174:17-175:7.)

## B. The Bank Audi Account

Petitioner testified that she knew that her mother had an account at Bank Audi in Switzerland because she went with her mother when Ms. Gonzalez opened the account. (Tr. at 58:12-17.) They opened the account in August of 2004. (GX 100.)

The banker who assisted Petitioner and Ms. Gonzalez in opening this account confirmed that he helped them open it, and he provided the original documents that they both signed to open the account. (CX 16.) In addition, under Swiss law, an accountholder must expressly identify a beneficial owner of the account. (CX 17; Gov't Add'l Br. Ex. 3, Jan. 31, 2020 [dkt. no. 151-3] 6.) The attorney who represented Petitioner and her mother in connection with the Mutual Legal Assistance Treaty requests made by the Department of Justice during the criminal case asserted that, after reviewing records related to this account, he was "not aware of" and does "not believe that anyone" was "ever identified or was ever in fact

a beneficial owner of any assets in the account." (CX 17.) The banker who assisted them in opening the account had the same recollection. (CX 16.)

Based on the available bank statements, Mr. Tchorznicki testified that this account was funded with $337,869.52 and €1,234,439.81 from the BBVA account. (Tr. at 137:9-14; GX 400.) There were several transfers of money within Bank Audi subaccounts. (GX 400.) Separately, there were nine cash withdrawals totaling €73,047.04. (GX 400.) During the time when Petitioner was a student in England, three transfers were made to the Architectural Association for a total of €27,145.79. (Id.) Within the bank records of the account, "there were deeds of endowment signed which permitted the bank to effect periodic transfers to" Petitioner. (Tr. at 139:23-25.)

### C. The UBS Luxemburg Account

This account was opened in May of 2003. (GX 100.) As noted previously, this account received a transfer of $1,001,507.57 from the BBVA account. (GX 300.) There were several transfers between UBS subaccounts, totaling $94,302 from the USD account to the Euro account and €90,545.84 from the Euro account to the USD account. (Id.) In addition, there were fourteen wire transfers totaling €58,806.58 from the UBS Euro account to Petitioner's account at Riggs Bank in London. (GX 300.) At the time of the transfers, Petitioner was a student in England. (Tr. at 134:9-12.)

### D. Other Financial Accounts & Information

Petitioner had some recollection of a Riggs London bank account and that she went with her mother to open it when she began her studies in England. (Tr. at 57:2-7; Dep. at 151:12-152:9, 154:20-25.) Mr. Tchorznicki testified that the first available bank statement for this account was from August of 2001 (i.e., after Petitioner moved to England) but he also acknowledged "there's a possibility that this account was in existence before August 2001." (Tr. at 158:6-12.)

Petitioner testified that her mother closed the Riggs account and then "sent all of the funds to France" into the BBVA account so that she could "set up a trust in Switzerland." (Dep. at 172:13-173:3.) Consistent with Petitioner's recollection, Mr. Tchorznicki testified that a wire was received for €1,229,605.51 from one of the Riggs accounts to the BBVA account. (Tr. at 163:25-164:5; GX 203.) Petitioner did not know why her mother "triangled" her money in the way just described — "[s]he just did." (Dep. at 173:4-10.)

## III. Conclusions of Law

The parties raise three legal issues. First, Petitioner argues that the Court does not have "jurisdiction" to "order forfeiture of the excess of the traceable funds." (Pet'r Post-Trial Br. a 5.) Second, she contends that the Government's theory that the Target Accounts facilitated Defendant's laundering of the

$2.5 million from the government of Taiwan is factually unsupported. (Id. at 7-11; see also, e.g., Tr. at 213:20-25 (probing why the facts of this case do not amount to mere pooling or comingling).) Finally, if forfeitable, the Government disputes that Petitioner has proven her entitlement to the excess funds in the Target Account. (Gov't Post-Trial Br. at 24-34 & n.16.)

## A. Jurisdiction

Petitioner first argues that because the Government did not assert that the excess in the Target Accounts was involved in the offense during the criminal proceeding, it has waived its ability to make that argument against Petitioner. (Pet'r Post-Trial Br. at 3, 7.) The plain text of the Specific Property Order forecloses Petitioner's argument. Paragraph one of that Order states that that the "Specific Property constitutes property involved in money laundering and is subject to forfeiture." Defendant explicitly agreed with the Government that the Specific Property was involved in his offense, and the Court accepted that representation. Therefore, the Government did not waive any claim to the Specific Property being involved in Defendant's money laundering.

Petitioner's remaining argument that the Court lacks jurisdiction is premature. Petitioner essentially contends that because the Forfeiture Orders are limited by Defendant's agreement to forfeit only his right, title, and interest in the Specific Property, the Court lacks jurisdiction over any property above the

$2.1 million that the Government traced as proceeds. (Id. at 6-7.)

The Court clearly has jurisdiction to resolve Petitioner's claim to the excess funds. The Forfeiture Orders arise out of the resolution of Defendant's criminal proceeding where the Government sought forfeiture pursuant to 18 U.S.C. § 982 for "all property, real and personal, involved in the money laundering offense charged in the Indictment and all property traceable to such property." Because Petitioner has asserted an interest in the forfeited property, the Court retains jurisdiction to resolve her claim via this ancillary proceeding. United States v. Bennett, No. 9-CR-639, 2004 WL 829015, at *3 (S.D.N.Y. Apr. 15, 2004) (citing 21 U.S.C. § 853(n)); Fed. R. Crim. P. 32.2(c)(1)("If, as prescribed by statute, a third party files a petition asserting an interest in the property to be forfeited, the court must conduct an ancillary proceeding." (emphasis added)).

This two-step process governing forfeiture is precisely what allows the Court to adjudicate Petitioner's claim. See United States v. Daugerdas, 892 F.3d 545, 549 (2d Cir. 2018). During step one, "criminal forfeiture is not a measure restricted to property owned by the criminal defendant; it reaches any property that is 'involved' in the offense." De Almeida v. United States, 459 F.3d 377, 381 (2d Cir. 2006). The provision of the statute governing ancillary proceedings reflects "[t]he likelihood that some

property involved in an offense will be owned by persons other than the criminal defendant," id., and it provides a mechanism for adjudicating whether that interest is superior to the Government's interest, PacNet Servs., Ltd. v. United States Dep't of the Treasury, No. 21-1069-CV, 2022 WL 2561204, at *1 (2d Cir. July 8, 2022) (summary order). If the Court determines that Petitioner's superior interest invalidates a portion of the Forfeiture Orders, then the Court will lack jurisdiction over the property, which will be reflected in the final forfeiture order. See United States v. Schwimmer, 968 F.2d 1570, 1581 (2d Cir. 1992).

### B. Forfeitability: Facilitation of Money Laundering

The parties agree that the Government will collect $2.1 million from the Target Accounts to recover the proceeds of Defendant's crime. The Government asserts that it is also entitled to the excess funds in the Target Accounts because the funds facilitated Defendant's money laundering. Petitioner argues that the record does not support the Government's theory because "the government did not support any inference of facilitation with any proof of such person's awareness or deliberate use of accounts to

camouflage ill-gotten gain nor that the defendant orchestrated it."[4] (Pet'r Post-Trial Br. at 10.)

Pursuant to 18 U.S.C. § 982(a)(1), a court imposing sentence on a criminal defendant convicted of money laundering "shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." As this Court previously explained:

> In interpreting what funds are "involved in" the offense, courts in this district have "embraced the facilitation approach," and the Court of Appeals "has affirmed forfeiture of property as involved in money laundering transactions when it has served as a conduit for the proceeds of the illegal transactions." United States v. Prevezon Holdings, Ltd., 251 F. Supp. 3d 684, 698 (S.D.N.Y. 2017) (internal citations and quotations omitted); see also In re 650 Fifth Ave. & Related Props., 777 F. Supp. 2d 529, 563-564 (S.D.N.Y. 2011). This means that otherwise "clean" property used to conceal or otherwise facilitate money laundering is also forfeitable.

---

[4] The Government has conceded that Petitioner may attack the forfeitability of the Specific Property. (See Gov't Letter, July 9, 2018 [dkt no. 120] 2; Gov't Post-Trial Br. at 9-19.) Moreover, given that the Government seeks to rely on the record from the criminal proceedings, Petitioner is afforded the opportunity to contest any factual findings. See United States v. Swartz Fam. Tr., 67 F.4th 505, 517 (2d Cir. 2023) ("[A] district court may rely on the record of a defendant's criminal) proceedings to 'determine what property is subject to forfeiture under [Section 853].' In addition, a district court may rely on a preliminary order of forfeiture in determining whether a third-party petition states a claim to the forfeitable property, so long as the third-party petitioner has an opportunity to challenge the factual findings made in support of the order after it has been entered." (alteration in original)(quoting Fed. R. Crim. P. 32.2(b)(1)(A)).

<u>Portillo I</u>, 2019 WL 1949861, at *2.

Likewise, untainted funds in the same account as tainted funds are forfeitable so long as the untainted funds facilitate the laundering of the tainted funds. <u>United States v. Approximately Six Hundred & Twenty Thousand Three Hundred & Forty-Nine Dollars & Eighty-Five Cents</u>, No. 13-CV-3966, 2015 WL 3604044, at *3 (E.D.N.Y. June 5, 2015); <u>see also</u> <u>United States v. Kenner</u>, 443 F. Supp. 3d 354, 373 (E.D.N.Y. 2020)(holding that even the "'clean' capital accounts would be forfeitable, as they helped to facilitate DCSL's purchase by concealing the tainted funds"). "Indeed, in many cases '[i]t is precisely the commingling of tainted funds with legitimate money that facilitates the laundering and enables it to continue.'" <u>United States v. Nicolo</u>, 597 F. Supp. 2d 342, 351 (W.D.N.Y. 2009) (quoting <u>United States v. Braxtonbrown-Smith</u>, 278 F.3d 1348, 1353 (D.C. Cir.2002)); <u>see</u> <u>Kenner</u>, 443 F. Supp. 3d at 365.

For example, the Eleventh Circuit affirmed forfeiture of a defendant's bank account that contained both legitimate and tainted funds because of evidence connecting the tainted funds in the account to the money laundering scheme. <u>United States v. Seher</u>, 562 F.3d 1344, 1369 (11th Cir. 2009). It was "reasonable to infer that the intermingling of tainted and legitimate proceeds 'act[ed] as a "cover" and hence reduced suspicion of' the source of the tainted funds," thereby "facilitating the laundering by disguising

the source of those tainted funds." Id. at 1369-70 (quoting United States v. Puche, 350 F.3d 1137, 1154 (11th Cir. 2003)). By contrast, in the same case, the Eleventh Circuit held that it would be improper to order forfeiture of a different bank account where there was no evidence linking it to the laundering offenses, such as evidence showing that money was deposited into the account. Id. at 1370. "[T]here must be evidence that some part of the property was used for illegal activities." Id.

Similarly, in United States v. Coffman, the Sixth Circuit affirmed the district court's order requiring forfeiture of a bank account that included both fraud proceeds and legitimate funds. 574 F. App'x 541, 561 (6th Cir. 2014). The Government provided evidence of bank records and charts "outlining the path of monies through all of the bank accounts," which was "sufficient to support a finding that [the defendant] commingled tainted and untainted funds for the purpose of concealment" because "[w]hen a sequence of transactions is sufficiently complex, a reasonable juror may infer that the transactions were made for the purpose of concealment." Id. (citation omitted). Moreover, the defendant transferred control of the funds to his wife and her companies, which further disguised his "continuing control of the funds." Id. at 562.

The record here supports that Defendant acted to conceal or disguise the source and character of the $2.5 million in checks from the government of Taiwan.

To begin with, Defendant himself admitted "that these transactions were designed, in part, to conceal and disguise the source and ownership of the money." (Plea Hearing at 27:21-23; see also Pre-Sentence Investigation Report ¶ 11 ("PORTLLLO and his co-conspirators used the BBVA Accounts in Paris to continue to conceal the source and origin of the illegally obtained funds."), ¶ 25 ("I knew that at least some of the proceeds from Taiwan were then transferred into an account in Europe, and that those proceeds were then further disbursed into different accounts and financial institutions in Europe into 2005.").)

Mr. Tchorznicki's testimony about the steps taken to place the funds into the Target Accounts further confirms that Defendant's conduct was intentional and designed to obscure the source of the funds. Through his tracing analysis, Mr. Tchorznicki observed that Defendant broke the original checks received from the Taiwanese government into smaller amounts before moving them around into various bank accounts and subaccounts across the world. (See, e.g., Tr. at 126:20-25, 127:3-15, 130:23-25, 132:8-15, 137:9-14; GX 201, 202, 203, 300, 400.) Defendant's intent can be inferred from the circuitous route the proceeds traveled to reach the Target Accounts. See Puche, 350 F.3d at 1153 ("GEC's accounts

were not a mere pooling of funds, but were an arrangement through which tainted funds could be transferred overseas."); Coffman, 574 F. App'x at 561. Indeed, Defendant's concealment of the funds was so effective that the Government could only trace approximately $2.1 of the $2.5 million.

Defendant also maintained significant control over the Target Accounts. Without any apparent obstacles, he moved the crime proceeds through the Target Accounts despite their being held in Ms. Gonzalez and/or Petitioner's names. See Nicolo, 597 F. Supp. 2d at 354 (holding that accounts held in wife's name were subject to forfeiture because accounts had sufficient nexus with money laundering as evidenced by the account's receipt of sums from defendant's business, the government's tracing of proceeds into the wife's accounts, and other indicia of the defendant's substantial control over the accounts during the time of his crimes). His control over the BBVA account is also evidenced by the COEGSA payment. While Defendant did not admit to receiving that payment, neither Petitioner nor her mother had connections to Guatemala apart from Defendant, and Petitioner was not aware of COEGSA or any connection between COEGSA and her mother. (Dep. at 13:14-15, 174:17-175:7; Tr. at 93:25-94:2.) Moreover, Defendant's choice to deposit the proceeds into accounts held by his ex-wife and daughter, especially a decade or longer after his divorce from

Ms. Gonzalez, necessarily aimed to obscure the proceeds' origin and character. Coffman, 574 F. App'x at 562.

For these reasons, it is reasonable to infer that these accounts and any untainted money in them was used to disguise and conceal Defendant's money laundering activities.

Petitioner's arguments that "the evidence does not support the government's theory of facilitation" (Pet'r Post-Trial Br. at 8), are unconvincing. That Petitioner's family's wealth may have been the source of the excess funds is of no moment. Assuming the Target Accounts included clean family funds, those funds would have further disguised Defendant's criminal activity. See United States v. Contents of Acct. Numbers 208-06070 & 208-06068-1-2, 847 F. Supp. 329, 335 (S.D.N.Y. 1994) ("That the Six Accounts may also contain the proceeds of legitimate income does not change the result. Any legitimate money in the Six Accounts would serve to further disguise the source of the illegitimate funds and to make the proceeds of the green card scheme more difficult to trace, and thereby facilitate Matos' money laundering scheme."). Petitioner adds that none of the bankers who assisted Defendant were charged as co-conspirators, and there is no evidence that they acted with intent to disguise the funds. (Pet'r Post-Trial Br. at 9-10.) Even so, the record supports that Defendant sought to conceal the $2.5 million using the Target Accounts and that there was "more than an incidental connection between" the Target Accounts and Defendant's

money laundering sufficient "to find that the property facilitated the commission of the offense," see United States v. Pilitz, No. 17-CR-0053, 2023 WL 3602877, at *14 (E.D.N.Y. May 23, 2023).

## C. Petitioner's Interest in the Target Accounts

That the Target Accounts facilitated Defendant's money laundering does not end the inquiry. Petitioner claims that she has a superior interest in the funds in the Target Accounts above the $2.1 million of crime proceeds, even if the accounts were involved in money laundering because she is the beneficial owner of the Target Accounts. (See Pet'r Post-Trial Br. at 4; Tr. at 218:14-19.) The Government argues, however, that "account ownership alone" cannot support that Petitioner has a superior interest in the Target Accounts, and asks that the Court apply the "dominion and control" test to evaluate whether Petitioner has a superior interest in the property. (Gov't Post-Trial Br. at 27-31.)

### 1. Dominion and Control

Under the "dominion and control" test, "[b]are legal title," without "'assertions of dominion, control or some other indicia of ownership of or interest in the seized property, is insufficient to confer standing to challenge a forfeiture.'" Coffman, 612 F. App'x at 286-87 (quoting United States v. $515,060.42, 152 F.3d 491, 498 n.6 (6th Cir. 1998))(holding that defendant's wife not entitled to funds forfeited as involved in money laundering in

accounts held in her name because defendant "exercised dominion and control over them")); see also United States v. Akhtar, No. 15-20600, 2017 WL 4778732, at *4 (E.D. Mich. Oct. 23, 2017) (concluding that "two accounts . . . in Petitioner's name, alone, is inadequate to support" that she has a superior interest), aff'd, No. 17-2339, 2018 WL 5883930 (6th Cir. Sept. 19, 2018).

The Court is dubious of the applicability of the dominion and control test for several reasons. First, it does not appear that the Second Circuit has applied the test to adjudicate a third-party's interest. See Daugerdas, 892 F.3d at 554 n.8 (2d Cir. 2018) (noting that other courts have "refused to recognize property interests" when the "transferee never exercised 'dominion and control' over the property" and citing cases from other jurisdictions).

In addition, the record here makes the application of the dominion and control test a closer call than in the cases upon which the Government relies, where the account holder exercised little to no control. See, e.g., United States v. One 1982 Porsche 928, Three-Door, License Plate 1986/NJ Temp./534807 (auto.), 732 F. Supp. 447, 449, 452 (S.D.N.Y. 1990) (claimants never drove the forfeited car and failed to provide receipts, bills of sale, registration forms or insurance papers relating to the vehicle); United States v. Morgan, 224 F.3d 339, 344 (4th Cir. 2000)(affirming that defendant's wife's name on an account was

insufficient to show her superior interest given that she had no power to dispose of the funds in the account, never used the account, and had "no idea" of the logistics of transactions related to the account); Coffman, 612 F. App'x at 286 (defendant exerted "primary control" over the accounts as evidenced, in part, by claimant "unquestioningly" complying with directions from defendant to take actions related to the account).

Here, by contrast, the record reveals that Ms. Gonzalez may have had some control over the Target Accounts. Ms. Gonzalez went to the relevant banks with Petitioner to open the accounts, she requested money be transferred into the BBVA account, and worked with bankers. (Tr. at 56:10-17, 58:12-17, 37:20-38:13; CX 16.) In addition, as Mr. Tchorznicki testified, based solely on the bank records, it appeared that Ms. Gonzalez personally conducted certain transactions with the relevant banks. (See Tr. at 184:16-185:22.) And while the timing of when Ms. Gonzalez opened the Target Accounts aligns with Defendant's conspiracy, it also matches with when Petitioner moved to and lived in England for school. (Dep. at 9:25-11:8, 11:10-12:3; Tr. at 32:12-13, 33:7-11). During that time, Ms. Gonzalez traveled in Europe to visit Petitioner and dreamed of moving there. (Dep. at 170:10-22; Tr. at 95:22-23.) So, when the Target Accounts were opened does not necessarily demonstrate that their primary purpose was for the conspiracy.

Nevertheless, the record as a whole supports that any control Ms. Gonzalez exercised was non-exclusive and sporadic in light of the control Defendant exercised over the Target Accounts. Even assuming that the Target Accounts contain untainted funds, they contain significantly greater funds that originate directly from Defendant's crimes ($2.1 million versus $800,000). And, for the reasons previously explained, the COEGSA payment traced by the Government provides additional evidence of Defendant's control over the Target Accounts. Thus, in total, over $2.6 million of the $2.9 million in the Target Accounts can fairly be associated with Defendant as opposed to Ms. Gonzalez. Moreover, as Petitioner admitted, she was unable to trace any legitimate money, including her family's funds, directly into the accounts. (Tr. at 79:3-19.) She also failed to provide any context or explain her mother's relationship to certain transactions, such as the COEGSA wire. That Ms. Gonzalez opened the accounts herself or, per the paper trail, executed certain bank transactions, does not overcome this evidence.

The burden falls on Petitioner to demonstrate sufficient control by a preponderance of the evidence. Simply put, she has failed to satisfy that burden here. The evidence marshaled does not sufficiently tip in Petitioner's favor to support that she and/or her mother had the requisite dominion and control over the

Target Accounts. Petitioner thus fails to assert a superior interest to the excess funds under this test.

### 2. The Law of the Relevant Jurisdictions

Although Petitioner cannot satisfy the dominion and control test to claim her interest in the Target Accounts, applying the analysis used by the Second Circuit in third-party challenges to forfeiture orders, Petitioner has proven that she has a superior interest in the excess funds.

"The extent of a petitioner's interest in the forfeited property is determined in accordance with state law." Portillo I, 2019 WL 1949861, at *3 (quoting Watts, 786 F.3d at 161 (citing Willis Mgmt. (Vt.), Ltd. v. United States, 652 F.3d 236, 242 (2d Cir. 2011))); see also, e.g., United States v. Swartz Fam. Tr., 67 F.4th 505, 516 (2d Cir. 2023) (applying state law to determine claimant's interest in forfeited property); United States v. Mosca, No. 21-1209, 2023 WL 6799293, at *2 (2d Cir. Oct. 16, 2023) (same); United States v. Wolf, 375 F. Supp. 3d 428, 436 (S.D.N.Y. 2019)(same); United States v. Kogan, No. 16-CR-221, 2022 WL 3362452, at *3 (S.D.N.Y. Aug. 15, 2022)(same).

It is undisputed that under the law of the relevant jurisdictions (i.e., France, Switzerland, and Luxembourg), the individual or entity who appears as the nominal or beneficial owner of an account is entitled to a rebuttable presumption of ownership. Portillo II, 2022 WL 624580, at *4. As applied here, and as this

Court previously concluded, "Ms. Gonzalez and/or Petitioner are presumed to be the beneficial owners of the Target Property at the time of Mr. Portillo's commission of the acts."[5] Id.

The Government asserts that "under the facts of this case," the presumption is "undeniably overcome." (Gov't Add'l Br., Jan. 31, 2020 [dkt. no. 151] 4.) It asserts that the same circumstances that demonstrate Defendant's dominion and control over the Target Accounts rebut the presumption, including Defendant's control over the accounts to effectuate the money laundering scheme, when the accounts where opened, their location, and Petitioner's inability to trace the excess funds to legitimate sources. (Gov't Post-Trial Br. at 34 n.16.) But the Government has failed to engage with the law of the relevant jurisdictions.

Under French law, the account holder is entitled to a presumption of ownership and the bank account is "indivisible," so there is also a presumption that the account holder owns "all the sums recorded in the account." (Gov't Add'l Br. Ex. 2, Jan. 31,

---

[5] The Government asserts that this Court's holding on this issue merely determined Petitioner's standing. (Gov't Post-Trial Br. at 33-34 n.16.) While the Court did not grant summary judgment for Petitioner, the Court's application of the law on this issue resolved it. Regardless, "the standing inquiry is 'identical to one "on the merits" to determine whether a third party meets the statute's requirements'" to assert an interest in the property. United States v. Church & Dwight Co., 510 F. App'x 55, 58 (2d Cir. 2013) (summary order) (quoting DSI Assocs. LLC v. United States, 496 F.3d 175, 183 n.9 (2d Cir. 2007)).

2020 [dkt. no. 151-2] 2.) In other words, a deposit into a French bank account "instantly" merges with the balance and "loses its individuality and particular characteristics as it forms part of the account balance." (Id.) Based on those presumptions, "funds deposited in a bank account normally cannot be seized for debts of the 'true' owner under civil law, but only for debts of the account holder." (Id. at 3.) The presumption has only been held to be overcome in "rare instances." (Id. at 5.)

In one case, because the funds were "attributed to a special purpose," the court concluded that the account holder did not own them. (Id. at 4.) There, it was clear that the funds were earmarked to "finance a specific real estate transaction" as evidenced by an assessment of contractual documents showing that the account was "dedicated to the real estate transaction" when it was opened, the account's exclusive use for the real estate transaction, and the flow of money in the account that followed a gradual pattern as the real estate transaction progressed. (Id. at 3-4.)

Separately, in certain circumstances where funds are held "on behalf of third parties" acting as a "syndicat des co-propriétaires," courts have held that the funds did "not belong to the account holder." (Id. at 4.) A "syndic" is a "company in charge of the administrative management of several properties" and, under French law, the "syndicat des co-propriétaires" does not have a

legal personality but refers to all co-owners of a property. (Id. at 4 nn. 9-10.)

Here, there is no evidence that the documents used to open the account limit the account's use to a specific purpose. Petitioner recalled going to Paris to open the BBVA account with her mother because Ms. Gonzalez dreamed of moving there. While the Government was able to trace funds in the BBVA account to COEGSA, which most likely is connected to Defendant and not Ms. Gonzalez, those funds were not set aside for a specific purpose once they reached the account. Moreover, there is no indication that Ms. Gonzalez held the funds on behalf of Defendant or acted in the capacity as a "syndicat des co-propriétaires." Therefore, the presumption has not been rebutted as to the BBVA account.

Under Swiss law, there are two ways to rebut the presumption that an account holder is the beneficial owner: "(a) if it can be established that the funds pertain to a beneficial owner who is different from the account holder, or (b) if the account is held by a company controlled by the debtor, to which he transferred his assets in a legally abusive manner." (Gov't Add'l Br. Ex. 3, at 4.) Banks require account holders to identify in writing the beneficial owner of the account when the owner is not the account holder. (Id. at 6.) That statement is relevant under (a) because if the account holder identifies another individual as the beneficial owner, "then there is a rebuttable presumption that the

36

third party named by the account holder is the beneficial owner." (Id. at 6-7.)

Applying those principles to the Bank Audi account, the Government has not rebutted the presumption of ownership. The account was not held by a company, so the second avenue to rebut the presumption is unavailable. As to the first, an attorney who assisted Ms. Gonzalez stated that he was "not aware of" and does "not believe that anyone" was "ever identified or was ever in fact a beneficial owner of any assets in the account." (CX 17.) The banker who helped Ms. Gonzalez and Petitioner open the account recalled the same. (CX 16.) Therefore, nothing on the record overcomes the presumption under Swiss law.

For the UBS account, under Luxembourg law, the presumption can only be rebutted when: (1) the owner of the bank account is acting as "precarious holder/at-will beneficiary" who is required to reimburse the funds rather than possess them as the owner; (2) the funds have been obtained unlawfully; or (3) there was "no intention of transfer of ownership." (Gov't Add'l Br. Ex. 1, Jan. 31, 2020 [dkt. no. 151-1] 3.) There is no evidence in the record of any of these circumstances to overcome the presumption of Petitioner's ownership to the excess funds (i.e., those funds not already proven to be obtained unlawfully) in the UBS account.

In sum, the Government has not defeated Petitioner's presumption of ownership under the law of the relevant jurisdictions.

## IV. **Conclusion**

For the reasons stated, the Government was entitled to seek forfeiture vis-à-vis the Defendant of funds "involved in" money laundering. However, the third-party Petition is GRANTED because Petitioner has proven a superior legal interest to the funds in the Target Accounts above the $2.1 million that was directly traceable to Defendant's crimes. Within two weeks of the date of this Opinion & Order, the parties shall jointly submit a final order of forfeiture for the Court's consideration.

**SO ORDERED.**

Dated:     July 29, 2024
           New York, New York

_Loretta A. Preska_
LORETTA A. PRESKA
Senior United States District Judge